IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-739

Filed 5 November 2025

Catawba County, No. 24CVD000904-170

DONNA DANIELLE SHULER, Plaintiff,

v.

ANDREW ROBERT DONAHUE, III, Defendant.

Appeal by plaintiff from order entered 2 May 2024 by Judge Wayne L. Michael in District Court, Catawba County.  Heard in the Court of Appeals 18 March 2025.

*King Law Offices, P.C., by Krista S. Peace, for plaintiff-appellant.*

*No brief filed for defendant-appellee.*

STROUD, Judge.

Plaintiff appeals from an Amended Domestic Violence Protective Order ("DVPO") against her in favor of Defendant.  Plaintiff initially sought a DVPO against Defendant, but Defendant filed a counterclaim seeking his own DVPO against Plaintiff.  The trial court heard both parties' claims at the same hearing; in addition to granting the DVPO against Plaintiff, the trial court also granted Plaintiff's claim for a DVPO against Defendant.  The trial court rendered its ruling on both the claim and counterclaim for DVPO at the same time but entered two separately filed orders. Plaintiff appealed the DVPO entered against her; Defendant did not appeal the DVPO entered against him.

We hold that the trial court's findings of fact support its conclusion of law that Plaintiff committed an act of domestic violence against Defendant, but because the DVPOs entered here were "mutual" orders under North Carolina General Statute Section 50B-3(b), the trial court was also required to make findings of fact that "both parties acted as aggressors, . . . neither party acted primarily in self-defense, and that the right of each party to due process [was] preserved" to enter the DVPOs. N.C. Gen. Stat. § 50B-3(b) (2023). Because the trial court did not make these required findings for mutual DVPOs, we must vacate and remand the Amended DVPO for additional findings of fact.

## I. Factual and Procedural Background

On 5 April 2024, Plaintiff filed a Complaint and Motion for DVPO against Defendant using the form "Complaint and Motion for Domestic Violence Protective Order" issued by the North Carolina Administrative Office of the Courts ("AOC"), AOC-G-250, Rev. 5/21. She alleged that she and Defendant "are current or former household members" and that they lived together "until Sunday, March 10[.]" She alleged that they had "argued about rent money for weeks," and on March 10, Defendant "packed up and left." She alleged "[h]e drove away from the home and came back and started to talk 10 minutes later" but she "reemphasized that [they] were broken up and asked him to leave[.]" She further alleged that he texted her "a couple times over the next couple of days about clothing" but she "never texted him." She "blocked his phone number on March 24" but he "used alternate messaging

platforms to message" her. Defendant continued to call "almost every day" and used "different random phone numbers to text" her. She also alleged that on "Tuesday, April 2," he "approached [her] at a bar" and she "ran away from him and hid in the bathroom." On April 3, Defendant "showed up at [her] house unannounced with 2 engagement rings." Her "garage was open and he stood outside." Defendant had parked "near [her] neighbor's house, far enough away to watch [her] pull in" and "he walked 200 yards" to her house. Plaintiff "shut the door and locked it" and did not "say anything."

On 5 April 2024, the trial court entered an *ex parte* DVPO order against Defendant, directing him not to "assault, threaten, abuse, follow, harass (by telephone, visiting the home or workplace or other means), or interfere with" Plaintiff. The DVPO also required that Defendant stay away from Plaintiff's residence, workplace, and "Coyote Joe's[,]" a local bar the parties frequented both during and after their relationship. A hearing on the DVPO was set for 16 April 2024.

On 16 April 2024, counsel for Defendant filed a notice of appearance and a Motion to Dismiss, Answer, and Counterclaim for a DVPO against Plaintiff. On 19 April 2024, Defendant filed an Amended Motion to Dismiss, Answer, and Counterclaim for DVPO. Defendant's counterclaim was not filed using the AOC domestic violence complaint form but the counterclaim included generally the same allegations and information as included in the AOC domestic violence complaint form in addition to the motion to dismiss and answer.

In the amended motion to dismiss, Defendant contended that Plaintiff "failed to explicitly show" that he had (1) "attempted to cause or ha[d] intentionally caused [her] bodily injury" or (2) "placed [her] or a member of [her] family in fear of imminent serious bodily injury" or "continued harassment." Defendant also contended that "Plaintiff failed to raise any allegations about substantial emotional distress."

In his counterclaim for DVPO, Defendant alleged that Plaintiff placed him "in fear of continued harassment that rises to such a level as to inflict substantial emotional distress" and "intentionally placed [him] at a substantial risk of physical and emotional injury" because she had: gone "through [his] phone and social media to see if he is talking to anyone else"; stalked him on social media platforms; "interrogat[ed]" his "friends . . . on social media resulting in . . . Defendant being isolated from others"; threatened "to leave Defendant if he did not give her access to his phone" and social media accounts; "slamm[ed] stuff"; accused "him of cheating"; "constantly put[ ] him down"; "scream[ed] and yell[ed] at Defendant keeping Defendant up at all hours of the night without any provocation"; and "br[o]k[e] and destroy[ed] property[,]" including the "glass in the shower." Her actions caused Defendant to be "fearful of being evicted from his residence[.]" Defendant also alleged Plaintiff "has used or threatened to use a deadly weapon against herself and has a pattern of prior conduct of using such threats of violence with a firearm[,]" including a threat to commit suicide in April 2022 with "a firearm pointed at her chest" and overdoses of "Baclofen twice (2021 and 2023)," with both resulting in her "being in

the ICU."

On 30 April 2024, the trial court held a hearing on Plaintiff's claim and Defendant's counterclaim for DVPOs. At the hearing, Plaintiff testified that she and Defendant began dating in the fall of 2020. Plaintiff characterized their relationship as being "on again[,]" "off again" until a "definitive breakup" on 10 March 2024. Plaintiff explained that she and Defendant had "been arguing on and off for the last two weeks" over whether they were going to move in together. The parties "could not reach an agreement[ ]" and Defendant left Plaintiff's home. Plaintiff made it "[a]bsolutely" clear to Defendant she "did not want any[]more contact with him[]" following the breakup. However, Plaintiff testified Defendant continued to reach out to her through "calls from his direct line[,] [a] lot of no caller ID calls, which he had a prior history of doing every other time [the parties'] had broken up[.]" Defendant would make "up to 20 [calls] at different times[,]" and "lots of text messages from his number and various other numbers."

Plaintiff further described two events when Defendant "showed up at [her] house . . . unannounced[ ]" and "uninvited." On 27 March 2024, Plaintiff arrived at her home and noticed that Defendant was there waiting for her. Plaintiff "quickly[]" pulled into her driveway and walked to her front door, and Defendant "ran up [the] driveway . . . with a card in his hand telling [her] he had this letter that explained everything he wanted to tell her." Plaintiff repeated to Defendant she was not interested and that "[t]his is over[,]" and explained that she would call the police if

he did not leave. On 3 April 2024, Defendant again showed up unannounced at Plaintiff's house. Plaintiff "ran into [her] house" and Defendant began "screaming at [her] to please talk to him," saying that he had gotten her two engagement rings.

Defendant also presented evidence at the hearing. He testified about the parties' relationship, which he also characterized as on-again and off-again. He testified that he had moved in with Plaintiff in December 2023 when she purchased her home, but he still had his own apartment because "she had demonstrated instability in her commitment to [their] relationship early on." They had moved in together previously in December 2020, but after visiting his family that year at Christmas, she told him he "need[ed] to move out." He moved to Tampa, Florida and within two weeks, "as soon as [he] had unloaded the [moving] truck[,]" Plaintiff wanted him to move back in with her. Defendant testified that they had broken up about seven times over the four years they had been dating. He said that each time they broke up, she would "block[ him] immediately and completely cut[] off contact." He also testified about Plaintiff's suicide attempts and his concerns about her mental health.

On 30 April 2024, at 5:14 pm, the trial court filed two DVPOs; one DVPO granted Plaintiff's claim for a DVPO, granting her protection against Defendant ("Plaintiff's DVPO"), and the other granted Defendant's counterclaim for a DVPO, granting him protection against Plaintiff ("Defendant's DVPO"). In the two DVPOs, the trial court granted essentially the same protections for each party against the

other.

On 2 May 2024, the trial court filed an Amended DVPO for Defendant ("Defendant's Amended DVPO"). Defendant's Amended DVPO stated that it was "[d]eclared in Open Court this the 30th day of April, 2024" and granted Defendant the same protections as Defendant's DVPO filed on 30 April 2024.

In Defendant's Amended DVPO, the trial court made the following findings of fact:

> 3. . . . Plaintiff placed in fear of continued harassment that rises to such a level as to inflict substantial emotional distress on . . . Defendant by going through . . . Defendant's phone and social media and other means to track him constantly, and alternately seeking and shunning his attention and affection.
>
> 4. . . . Plaintiff is in possession of, owns or has access to firearms, ammunition, and gun permits being one (1) handgun.
>
> 5. . . . Plaintiff made threats to commit suicide.

The trial court ordered as follows:

> 1. . . . Plaintiff shall not assault, threaten, abuse, follow, harass (by telephone, visiting the home or workplace, or other means), or interfere with . . . Defendant. A law enforcement officer shall arrest . . . Plaintiff if the officer has probable cause to believe . . . Plaintiff has violated this provision.
>
> 2. . . . Plaintiff shall stay away from . . . Defendant's residence or any place where . . . Defendant receives temporary shelter. A law enforcement officer shall arrest . . . Plaintiff if the officer has probable cause to believe . . . Plaintiff has violated this provision.

3. . . . Plaintiff shall stay away from the following places: the place where . . . Defendant works, the Rose, and Coyote Joes.

4. . . . Plaintiff is prohibited from possessing or receiving, purchasing a firearm for the effective period of this Order, and . . . Plaintiff's concealed handgun permit is suspended for the effective period of this Order.

5. . . . Plaintiff is to surrender to the sheriff serving this order the firearms, ammunition, and gun permits as described in block No. 4 of the Findings on Page 2 of this Order and any other firearms and ammunition in . . . Plaintiff's care, custody, possession, ownership or control.

. . . .

6. That . . . Defendant, through his attorney, shall provide a list of his personal property which he contends is still at . . . Plaintiff's residence. . . . Plaintiff, through her attorney, shall arrange how she will return those items to . . . Defendant.

7. The terms of this order shall be effective until April 30, 2025.

Plaintiff's DVPO is on the form Domestic Violence Order of Protection, AOC-CV-306, Rev. 3/22. The trial court found Defendant placed her "in fear of continued harassment that rises to such a level as to inflict substantial emotional distress[.]" The trial court also found that from March 2024 until he was served with process, Defendant was "repeatedly texting and phoning . . . [D]efendant, including from disguised numbers, after the parties (sic) breakup and after being asked not to contact her, and going to her home uninvited on at least 2 occasions after the breakup." The decree provisions in Plaintiff's DVPO mirror those in Defendant's Amended DVPO.

Plaintiff timely filed notice of appeal of Defendant's Amended DVPO on 15 May 2024. Defendant did not appeal Plaintiff's DVPO, nor did he submit a brief challenging the arguments presented by Plaintiff in this appeal.

Although Defendant's Amended DVPO by its terms expired on 30 April 2025, we first note that Plaintiff's appeal is not moot because of the "stigma that is likely to attach to a person judicially determined to have committed domestic abuse." *Smith ex rel. Smith v. Smith*, 145 N.C. App. 434, 437, 549 S.E.2d 912, 914 (2001) (citations, quotation marks, and brackets omitted). This Court has held that an appeal of a DVPO is not rendered moot by expiration of the order on appeal because the party affected by the order "may suffer collateral legal consequences as a result of the entry of the order." *Id.* at 436, 549 S.E.2d at 914. In addition to potential "collateral legal consequences, there are numerous non-legal collateral consequences to entry of a domestic violence protective order that render expired orders appealable." *Id.* at 437, 549 S.E.2d at 914. These non-legal collateral consequences may affect "a person applying for a job, a professional license, a government position, admission to an academic institution, or the like[.]" *Id.* (citation and quotation marks omitted).

## II. Analysis

On appeal, Plaintiff argues there was insufficient evidence to support parts of the trial court's findings of fact and that the findings were insufficient to support its conclusions of law and entry of Defendant's Amended DVPO against her. Further, Plaintiff argues the trial court did not make sufficient findings "to support the entry

of a mutual DVPO."

> On appeal from a DVPO, the trial court sits without a jury so,
>
>> the standard of review . . . is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. Where there is competent evidence to support the trial court's findings of fact, those findings are binding on appeal.

*Hensey v. Hennessy*, 201 N.C. App. 56, 59, 685 S.E.2d 541, 544 (2009) (quotation marks omitted) (quoting *Burress v. Burress*, 195 N.C. App. 447, 449-50, 672 S.E.2d 732, 734 (2009)).

## A.  Sufficiency of Evidence to Support Findings for Entry of DVPO

Plaintiff argues there was insufficient evidence to support the trial court's findings of fact and that the findings were insufficient to support its conclusions of law and entry of Defendant's Amended DVPO.  We will first address whether the findings of fact support entry of a DVPO, without consideration of the requirements for a mutual DVPO, because if the findings do not support entry of a DVPO, they could not support a mutual DVPO.

In this case, Defendant did not allege Plaintiff had injured him or attempted to cause him bodily injury or that she committed any of the acts listed in North Carolina General Statute Sections 14-27.2 through 14-27.7.  Instead, as in *Kennedy v. Morgan*, his claim was based on the allegation of

> fear of continued harassment that rises to such a level as to inflict substantial emotional distress. Thus, under the

> facts presented in this situation, under [North Carolina General Statute Section] 50B-1(a)(2), a conclusion of law that an act of domestic violence has occurred required evidence and findings of the following: (1) [the d]efendant has or has had a personal relationship . . . with [the] plaintiff; (2) [the] defendant committed one or more acts upon [the] plaintiff or a minor child residing with or in the custody of [the] plaintiff; (3) the act or acts of [the] defendant placed [the] plaintiff or a member of her family or household in fear of imminent serious bodily injury *or* continued harassment . . . ; and (4) the fear rises to such a level as to inflict substantial emotional distress.

221 N.C. App. 219, 222, 726 S.E.2d 193, 195 (2012) (emphasis in original) (citations, brackets, ellipsis, and footnote omitted) (quoting N.C. Gen. Stat. § 50B-1 (2011)).

Plaintiff challenges the third and fourth elements required under North Carolina General Statute Section 50B-1(a)(2): the trial court's findings that "(3) the act or acts of [D]efendant placed [her] or a member of her family or household in fear of imminent serious bodily injury *or* continued harassment . . . [;] and (4) the fear rises to such a level as to inflict substantial emotional distress." *Id.* (emphasis in original) (citation, quotation marks, brackets, and ellipsis omitted).

Plaintiff first argues that "the record is wholly devoid of competent evidence to support the entry of the DVPO against [her]." Specifically, Plaintiff contends "[t]he record and . . . transcript are wholly devoid of evidence to support" the trial court's Finding of Fact 3, which reads:

> . . . Plaintiff placed in fear of continued harassment that rises to such a level as to inflict substantial emotional distress on . . . Defendant by going through . . . Defendant's phone and social media and other means to track him

> constantly, and alternately seeking and shunning his attention and affection.

Plaintiff does not challenge the trial court's other findings that she "is in possession of, owns or has access to firearms, ammunition, and gun permits being one . . . handgun[,]" and that she "made threats to commit suicide." "The trial court's unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal." *Peltzer v. Peltzer*, 222 N.C. App. 784, 787, 732 S.E.2d 357, 360 (2012) (citation omitted).

The trial court found that "Plaintiff placed in fear of continued harassment that rises to such level as to inflict substantial emotional distress on . . . Defendant *by going through . . . Defendant's phone and social media and other means to track him constantly, and alternately seeking and shunning his attention and affection.*" (Emphasis added.) We note that Plaintiff does not claim the evidence fails to support the finding that she went "through the Defendant's phone and social media" or that she was "alternately seeking and shunning his attention and affection." And the evidence does abundantly support these portions of the findings. Plaintiff contends that the evidence does not support the portion of the finding that she used the information from his phone or social media "to track him constantly."

In *Moorhead v. Moorhead*, this Court addressed the findings required for harassment, the "second statutory definition of domestic violence:"

> [The p]laintiff sought and was granted a DVPO
> under the second statutory definition of domestic violence:

- 12 -

placing the aggrieved party or a member of the aggrieved party's family or household in fear of continued harassment, as defined in North Carolina General Statute Section 14-277.3A, that rises to such a level as to inflict substantial emotional distress. N.C. Gen. Stat. § 50B-1(a)(2) (2023). Section 14-277.3A delineates the criminal offense of "stalking" and includes the following definition pertinent to this appeal:

> (2) Harasses or harassment. — Knowing conduct, including written or printed communication or transmission, telephone, cellular, or other wireless telephonic communication, facsimile transmission, pager messages or transmissions, answering machine or voice mail messages or transmissions, and electronic mail messages or other computerized or electronic transmissions directed at a specific person that torments, terrorizes, or terrifies that person and *that serves no legitimate purpose.*

N.C. Gen. Stat. § 14-277.3A(b)(2) (2023) (emphasis added). Under these statutes, the trial court must make findings of fact regarding the defendant's conduct, the effect of the conduct on the plaintiff, and whether the defendant's conduct serves no legitimate purpose. We review the findings of fact to determine if they are supported by competent evidence, and we defer to the trial court's assessment of the defendant's credibility and whether the defendant's actions served no legitimate purpose.

296 N.C. App. 90, 94, 909 S.E.2d 327, 330-31 (2024) (citations, quotation marks, and brackets omitted).

Plaintiff argues that there was no evidence that she had "tracked" Defendant, even if the evidence did show that she had "gone through Defendant's phone and social media." Plaintiff is correct; Defendant did not contend that Plaintiff had tracked him. Defendant also did not testify at the hearing about some of the

allegations in his complaint. For example, he did not present any evidence to support his allegations that Plaintiff had broken or thrown something or broken glass in the shower.

The definition of "harassment" applicable under North Carolina General Statute Section 50B-1 is more than conduct that is irritating or annoying, even if the conduct causes "substantial emotional distress[.]" N.C. Gen. Stat. § 50B-1(a)(2). Domestic violence requires "harassment, as defined in [North Carolina General Statute Section] 14-277.3A, that rises to such a level as to inflict substantial emotional distress[.]" *Id.* Harassment is

> [k]nowing conduct, including written or printed communication or transmission, telephone, cellular, or other wireless telephonic communication, facsimile transmission, pager messages or transmissions, answering machine or voice mail messages or transmissions, and electronic mail messages or other computerized or electronic transmissions directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose.

N.C. Gen. Stat. § 14-277.3A(b)(2) (2023). In *Moorhead*, the defendant contended his actions did not constitute "harassment" because he had a legitimate purpose for placing a tracker on the plaintiff's car, accessing security cameras in her home, and hiring a private detective to follow her. *See* 296 N.C. App. at 95, 909 S.E.2d at 331. The defendant claimed he had a legitimate purpose of monitoring the car's condition and making sure the plaintiff did not expose their children to any dangerous people. *See id.* But this Court did not affirm the trial court's finding of harassment based

only on the defendant's acts of placing a tracker on the car or his obtaining information about the plaintiff using the camera or an investigator; the relevant findings were about the absence of a legitimate purpose for the defendant's actions *and* his use of information he obtained to harass the plaintiff:

> As the trial court found, it was not simply – or even primarily – [the d]efendant's placement of a tracking device on [the p]laintiff's car, his hiring of a private investigator to monitor [the p]laintiff, or his access of security cameras inside [the p]laintiff's home that formed the gravamen of his harassment of [the p]laintiff. As the trial court found, [the d]efendant used the information he uncovered to harass [the p]laintiff by email, in-person confrontation, text, and phone calls.
>
> . . . .
>
> The trial court found [the d]efendant used the information he obtained from the investigator to let [the p]laintiff know he knew where she was traveling or that he had seen [the p]laintiff's boyfriend playing volleyball with the parties' children inside [the p]laintiff's home. *[The p]laintiff's testimony that those communications made her feel "unsafe," "panicked," and harassed was competent evidence for the trial court to consider*. The determination that [the d]efendant's acts – communicating that he knew where [the p]laintiff was and what was occurring in the privacy of her home – served no legitimate purpose was reserved for the finder of fact, and there was competent evidence to support it.

*Id.* at 94-97, 909 S.E.2d at 331-32 (emphasis added) (citation, quotation marks, brackets, and emphasis omitted).

In *Moorhead*, the plaintiff also "testified about the fear and anxiety she experienced because of [the d]efendant's communications[.]" *Id.* at 98, 909 S.E.2d at

333. Here, Defendant did not testify about any fear or anxiety caused by Plaintiff going through his cell phone. Instead, he testified that this was a breach of trust:

> We agreed to have shared phones, and so I did. You know, she had entire access to my phone, but I don't expect to wake up at 4:00 a.m. and find you on the toilet reading my phone, you know. I should be able to have private conversations with my brother and things like that. I don't know. I felt like that was a bridge too far.

Unlike *Moorhead*, here the trial court made no findings regarding whether Plaintiff's conduct of going through Defendant's phone or social media served a legitimate purpose. And even if we assume that Plaintiff had no legitimate purpose to go through Defendant's phone and social media, the trial court made no findings about the effect on Defendant or how Plaintiff used any information she may have obtained. There is also no evidence and no finding that Defendant was "torment[ed], terrorize[d], or terrifie[d,]" N.C. Gen. Stat. § 14-277.3A(b)(2), solely by Plaintiff's action of "going through Defendant's phone and social media." Thus, the trial court's finding that Plaintiff had "track[ed] him constantly" and that this "tracking" him constituted "continued harassment that rises to such a level as to inflict substantial emotional distress" was not supported by the evidence. However, the trial court's other findings of fact are unchallenged, so we must consider whether the remaining findings support the trial court's conclusion of an act of domestic violence.

## B. Conclusion of Law of Acts of Domestic Violence

Plaintiff next argues that even if supported by competent evidence, "the trial

court[']s findings of fact were insufficient to support its conclusions of law." The trial court made the following conclusions of law: "1. . . . Plaintiff has committed acts of domestic violence against . . . Defendant"; and "2. [t]here is danger of serious and immediate injury to . . . Defendant."

Plaintiff contends the "only 'act' " the trial court found that "Plaintiff committed" was " 'going through . . . Defendant's phone and social media . . . , and alternately seeking and shunning his attention and affection.' " Such finding, Plaintiff claims, was not sufficient to support the trial court's conclusion that an act of domestic violence occurred under North Carolina General Statute Section 50B-1(a)(2). But the trial court did make other findings, so we must consider all the unchallenged findings and the findings supported by the evidence to determine if they support the trial court's conclusions of law.

Unlike a trial court's findings of fact, "conclusions of law are reviewable *de novo* on appeal." *Bunting v. Bunting*, 266 N.C. App. 243, 249, 832 S.E.2d 183, 188 (2019) (citation and quotation marks omitted).

Under Section 50B-1(a) of our North Carolina General Statutes,

> [d]omestic violence means the commission of one or more of the following acts upon an aggrieved party . . . by a person with whom the aggrieved party has or has had a personal relationship, but does not include acts of self-defense:
>
> > (1) Attempting to cause bodily injury, or intentionally causing bodily injury; or

(2) Placing the aggrieved party or a member of the aggrieved party's family or household in fear of imminent serious bodily injury or continued harassment, as defined in [North Carolina General Statute Section] 14-277.3A, that rises to such a level as to inflict substantial emotional distress; or

(3) Committing any act defined in [North Carolina General Statute Sections] 14-27.21 through . . . 14-27.33.

N.C. Gen. Stat. § 50B-1(a). North Carolina General Statute Section 50B-3 designates that "[i]f the court . . . finds that an act of domestic violence has occurred, the court shall grant a protective order restraining the defendant from further acts of domestic violence." N.C. Gen. Stat. § 50B-3(a) (2023). "Although [North Carolina General Statute Section] 50B-3(a) states that the trial court must 'find' that an act of domestic violence has occurred, in fact this is a conclusion of law[.]" *Kennedy,* 221 N.C. App. at 223 n.2, 726 S.E.2d at 196 n.2.

> The conclusion of law must be based upon the findings of fact. While the trial court need not set forth the evidence in detail it does need to make findings of ultimate fact which are supported by the evidence; the findings must identify the basis for the act of domestic violence.

*Id.* at 223-24, 726 S.E.2d at 196 (citations and quotation marks omitted).

Here, the trial court concluded "Plaintiff has committed acts of domestic violence against . . . Defendant[]" and that "[t]here is danger of serious and immediate injury to . . . Defendant." The trial court granted Defendant protections from Plaintiff under Section 50B-1(a)(2), finding that she "placed [Defendant] in fear of continued

harassment that rises to such a level as to inflict substantial emotional distress[.]" As noted above, "harassment" is "[k]nowing conduct . . . directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose." N.C. Gen. Stat. § 14-277.3A(b)(2).

> Thus, to support a conclusion of law that an act of domestic violence has occurred due to harassment, . . . there must also be evidence . . . that [a party]'s acts (1) were knowing, (2) were directed at a specific person, . . . (3) tormented, terrorized, or terrified the person, . . . and (4) served no legitimate purpose.

*Kennedy*, 221 N.C. App. at 222, 726 S.E.2d at 195-96 (citation, quotation marks, and brackets omitted).

We have already determined that a portion of Finding of Fact No. 3 is not supported by the evidence, at least to the extent the trial court found Plaintiff was "tracking" Defendant using information from his phone or social media. We must therefore consider whether the remaining findings can support the trial court's conclusion of law that an act of domestic violence occurred.

The part of Finding No. 3 supported by the evidence is that Plaintiff was "going through the Defendant's phone and social media and other means . . . and alternately seeking and shunning his attention and affection." The unchallenged findings are that Plaintiff "is in possession of, owns or has access to firearms, ammunition, and gun permits being one . . . handgun[,]" and that she "made threats to commit suicide." Although the trial court did not specifically identify Plaintiff's ownership of guns or

her suicide attempts as causing Defendant to be "in fear of continued harassment that rises to such a level as to inflict substantial emotional distress," we conduct *de novo* review to determine if these findings, along with the supported portions of Finding No. 3, support the conclusion of law.

North Carolina General Statute Section 50B-3.1(a) specifically addresses a "[t]hreat[] to commit suicide" as one of the factors which will support an order requiring the perpetrator of domestic violence to be required to surrender firearms. *See* N.C. Gen. Stat. § 50B-3.1(a) ("Required Surrender of Firearms.-- Upon issuance of an emergency or ex parte order pursuant to this Chapter, the court shall order the defendant to surrender to the sheriff all firearms, machine guns, ammunition, permits to purchase firearms, and permits to carry concealed firearms that are in the care, custody, possession, ownership, or control of the defendant if the court finds any of the following factors: . . . (3) Threats to commit suicide by the defendant."). Our cases have normally addressed findings regarding threats to commit suicide in the context of a challenge to the trial court's order requiring a defendant to surrender firearms, but in those cases, a threat to commit suicide, particularly in the presence of the other party to the domestic violence case, may be part of the harassment of the victim. *See, e.g.*, *Moorhead*, 296 N.C. App. at 99, 909 S.E.2d at 333-34.

In the context of a criminal case, our Supreme Court has noted that threats to commit suicide can be a "component" of "terroristic threats[.]" *See State v. Moore*, 315 N.C. 738, 745, 340 S.E.2d 401, 406 (1986) ("Although we have found no cases in which

threatening to commit suicide has alone been held to constitute terrorizing, the threat of suicide was a component in a Minnesota case in which the defendant was convicted of terroristic threats after making phone calls to his former wife's sister threatening to kill the former wife, the wife's fiance, and himself if his former wife and her fiance got married."). Certainly, attempted suicide and threats of suicide do not serve a legitimate purpose, so we must consider whether Plaintiff's suicide threats may be considered as "[k]nowing conduct . . . directed at a specific person that torments, terrorizes, or terrifies that person[.]" N.C. Gen. Stat. § 14-277.3A(b)(2).

Based on the evidence here, Plaintiff's purpose in her suicide attempts or threats was to torment or terrorize Defendant—the evidence showed that she had attempted or threatened suicide at least twice in response to the parties breaking up. The parties had been through this same type of situation before more than once. The evidence showed that Plaintiff had threatened suicide on "two occasions" when the parties had broken up. The first suicide attempt occurred when Plaintiff had "OD'd on Baclofen" after Defendant discovered Plaintiff had been unfaithful to him at a work conference. A year later, Defendant was "in her car when she had the revolver to her chest" and Plaintiff said that if Defendant left her, "[she] ha[d] nothing to live for." Based on these events, Defendant testified that he had "concerns about her mental health" when the two of them broke up, and he had these same concerns when they broke up in March of 2024.

The trial court's findings of Plaintiff's suicide attempts and gun ownership,

along with her actions of "going through . . . Defendant's phone and social media" and "alternately seeking and shunning his attention and affection" support the trial court's conclusion that an act of domestic violence based on Plaintiff's acts occurred. And Plaintiff's acts were: (1) "[k]nowing"; (2) "directed at a specific person"; (3) "torment[ed], terrorize[d], or terrifie[d] that person"; and (4) "serve[d] no legitimate purpose." *Id.*

Plaintiff does not contend that she did not threaten or attempt suicide in response to prior break-ups. She argues instead that the evidence only gives a "vague timeline" of these events and that they "appeared to have taken place during the course of the parties (sic) relationship and relate solely to his dissatisfaction with the relationship and not to anything amounting to domestic violence pursuant to [Section ] 50B." But Plaintiff also acknowledges that the evidence shows that one of the suicidal events was in August of 2022 and the other was "prior to the August 2022 incident." Essentially, Plaintiff argues her suicide attempts are not really relevant because they occurred long ago. But the trial court is the sole judge of the weight and credibility of the evidence, and Plaintiff did not challenge the trial court's finding that she was "alternately seeking and shunning [Defendant's] attention and affection" and that she had attempted suicide. We cannot substitute our judgment for that of the trial court. *See Crenshaw v. Crenshaw*, 296 N.C. App. 1, 21, 907 S.E.2d 743, 755 (2024) ("The trial court, as the fact finder, is the sole judge of the credibility and weight to be given to the evidence, and it is not the role of the appellate court to

substitute its judgment for that of the trial court." (citation and quotation marks omitted)).

The evidence overall showed a long pattern of break-ups and reconciliations and much emotional drama on both sides of the relationship during the entire four years. Defendant testified that they had broken up about seven times, and Plaintiff had threatened suicide in relation to two of those incidents. Based on the evidence, Plaintiff's suicide attempts were directed at Defendant and seeking to force him not to leave her. The overdose occurred after Defendant had learned of Plaintiff's infidelity. She threatened to kill herself by pointing a gun at her chest in a car, in Defendant's presence, because she would have "nothing to live for" if they broke up. She threatened to shoot herself only inches away from Defendant because they were breaking up. Both attempts arose from the potential end of the parties' relationship. The fact that Plaintiff still owned guns also supports the trial court's conclusion, as one of Plaintiff's suicide attempts involved use of a gun. The trial court properly considered this context in finding harassment as the suicide threats and attempts were (1) "[k]nowing"; (2) "directed at a specific person"; (3) "torment[ed], terrorize[d], or terrifie[d] that person"; and (4) "serve[d] no legitimate purpose." N.C. Gen. Stat. § 14-277.3A(b)(2). The trial court's conclusion of law as to an act of domestic violence was therefore supported by the unchallenged and supported findings of fact.

## C. Mutual DVPOs

Though we conclude that all but one portion of one of the trial court's findings

were supported by competent evidence, and the remaining findings did support the trial court's conclusion of law as to the commission of an act of domestic violence, we must remand for the trial court to make additional findings of fact. The trial court clearly intended to enter mutual DVPOs but did not make statutorily required findings to support such entries of mutual DVPOs.

Here, the trial entered two orders: a DVPO against Defendant and a DVPO against Plaintiff. Both included essentially the same decree provisions as to protection. The trial court rendered its rulings on Plaintiff's DVPO and Defendant's DVPO at the same time, at the close of the hearing on Plaintiff's claim and Defendant's counterclaim. The trial court also filed the two DVPOs at the same time on 30 April 2024 at 5:14 pm. Two days later, the trial court filed Defendant's Amended DVPO, which is the order on appeal, but the Amended DVPO does not have any differences relevant to this appeal from Defendant's DVPO filed on 30 April 2024. Plaintiff's DVPO entered against Defendant was filed using a standard AOC domestic violence order form, but the DVPO entered against Plaintiff was not on the standard form. Though not filed using the standard AOC form, Defendant's DVPO against Plaintiff included essentially the same language as to the findings of fact and conclusions of law and other provisions as used on the standard AOC domestic violence order form.

According to the hearing transcript, the trial court entered these orders in this manner because the standard AOC domestic violence order form, AOC-CV-306, Rev.

3/22, does not have check boxes or preprinted language required for entry of mutual DVPOs. The trial court explained this at the hearing's conclusion:

> Now, the form of the order in favor of [Defendant] against [Plaintiff] is problematic because *it doesn't fit the form*. Okay? As a matter of practicality it would have been better had you filed a separate action seeking 50B relief. You're certainly entitled to do it the way you did it. The Rules of Civil Procedure, Rule 2 provides there's one form of action and Rule 18 provides you join any forms of action. So legally you're absolutely correct. *Only [problem] is it won't fit in the computer. Now, I have prepared with the Clerk's assistance an order in favor of [Defendant] against [Plaintiff] but the order identifies him as the plaintiff and her as the defendant and that can be very confusing.* Here's that order. You've got to fix it.

(Emphasis added.)

As a general rule, trial courts use the standard AOC domestic violence order form to help ensure compliance with statutory requirements. It also allows for easy entry of domestic violence orders into the National Crime Information Center registry.

> (c) A copy of any order entered and filed under this Article shall be issued to each party. Law enforcement agencies shall accept receipt of copies of the order issued by the clerk of court by electronic or facsimile transmission for service on defendants. In addition, a copy of the order shall be issued promptly to and retained by the police department of the city of the victim's residence.
>
> . . . .
>
> (c1) When a protective order issued under this Chapter is filed with the Clerk of Superior Court, the clerk shall provide to the applicant an informational sheet developed

- 25 -

by the Administrative Office of the Courts that includes:

(1) Domestic violence agencies and services.

. . . .

(d) The sheriff of the county where a domestic violence order is entered shall provide for prompt entry of the order into the National Crime Information Center registry and shall provide for access of such orders to magistrates on a 24-hour-a-day basis.

N.C. Gen. Stat. §§ 50B-3(c)-(d).

But the standard AOC domestic violence order form contemplates only one claim per file number and only one order against one defendant. Or as the trial court put it: the problem with addressing both a claim and counterclaim for DVPO in the same order and file number is that "it doesn't fit the form." In addition, the trial court noted that mutual DVPOs in the same case "won't fit in the computer."

Here, we must first determine whether the trial court's orders, read together, constitute mutual DVPOs as contemplated by North Carolina General Statute Section 50B-3(b). That provision does not explicitly define a "mutual" DVPO, but it does describe what "mutual" protective orders must include:

> Protective orders entered, including consent orders, shall not be mutual in nature except where both parties file a claim and the court makes detailed findings of fact indicating that both parties acted as aggressors, that neither party acted primarily in self-defense, and that the right of each party to due process is preserved.

N.C. Gen. Stat. § 50B-3.

Here, both parties filed a claim for a DVPO under North Carolina General

Statute Section 50B-3. The statute provides that protective orders "shall not be mutual in nature" except under certain circumstances. The term "shall" is mandatory, so for the trial court to enter "mutual" DVPOs, it must comply with this statute. *See Silver v. Halifax Cnty. Bd. of Comm'rs*, 371 N.C. 855, 863, 821 S.E.2d 755, 761 (2018) ("As used in statutes, the word 'shall' is generally imperative or mandatory." (citation and quotation marks omitted)). Although Defendant filed his claim as a counterclaim to Plaintiff's complaint, Defendant clearly filed a claim for a DVPO under North Carolina General Statute Section 50B-3. Thus, the first condition for "mutual" orders, that "both parties file a claim[,]" has been satisfied in this case.

Since the term "mutual" is not defined by the statute, we use the word's ordinary meaning. *See Regional Acceptance Corp. v. Powers*, 327 N.C. 274, 278, 394 S.E.2d 147, 149 (1990) ("Where words of a statute are not defined, the courts presume that the legislature intended to give them their ordinary meaning determined according to the context in which those words are ordinarily used." (citation omitted)). Black's Law Dictionary defines "mutual" as "[g]enerally, directed by each toward the other or others; reciprocal." *Mutual*, Black's Law Dictionary (12th ed. 2024). Under this definition, based on the language of the trial court's orders and the context of this action, we conclude the two DVPO orders are mutual DVPOs.

The language in Defendant's DVPO and Defendant's Amended DVPO indicates both claims were heard on 30 April 2024 "based upon . . . Plaintiff's claim for Domestic Violence *and* . . . Defendant's counterclaim for Domestic Violence."

(Emphasis added.) Although the two claims for DVPO could have been filed separately, as the trial court correctly noted, the claims were in the same action. The manner of filing the claims, in the same file number as a claim and counterclaim or as separate claims, does not alone determine whether the DVPOs are mutual DVPOs. But here, where both Plaintiff's claim for protection and Defendant's counterclaim for protection were heard on the same date and the trial court granted reciprocal protections to both parties after considering evidence presented at this hearing, we conclude these orders were mutual DVPOs.

The second requirement for "mutual" DVPOs is that the trial court must make "detailed findings of fact indicating that both parties acted as aggressors" and "that neither party acted primarily in self-defense." *See* N.C. Gen. Stat. § 14-277.3A(b)(2). Further, these are findings the trial court "*shall*" make, *id.* (emphasis added), so these findings are mandatory for the entry of mutual DVPOs.

In Defendant's DVPO, the trial court found Plaintiff went "through . . . Defendant's phone and social media[,]" and was "alternately seeking and shunning his attention and affection." In Plaintiff's DVPO, the trial court found Defendant "repeatedly text[ed] and phon[ed] . . . [Plaintiff], including from disguised numbers, after the parties' breakup and after being asked not to contact [Plaintiff,]" along with "going to her house uninvited on at least [two] occasions after their breakup." These findings address only the events surrounding their breakup and do not clearly address either party acting as an "aggressor." There was no evidence of self-defense

presented, but the trial court did not make a finding that "neither party acted primarily in self-defense."

We note that the requirement for findings regarding acting as an "aggressor" and not acting in self-defense may be easier to apply in cases where domestic violence is alleged based on a party's attempt "to cause bodily injury, or intentionally causing bodily injury[,]" or "[p]lacing the aggrieved party or a member of the aggrieved party's family or household in fear of imminent serious bodily injury." N.C. Gen. Stat. § 50B-1(a). What qualifies as "aggression" or "self-defense" is less clear in the context of domestic violence committed by acts of "harassment, as defined in [North Carolina General Statute Section] 14-277.3A, that rises to such a level as to inflict substantial emotional distress." *Id.*

North Carolina General Statute Section 50B-1 does not define "aggressor," so we apply that term's ordinary dictionary definition. Merriam-Webster defines "aggressor" as "one that commits or practices aggression." *Aggressor*, Merriam-Webster's Collegiate Dictionary (11th ed. 2007). Merriam-Webster then defines "aggression" as (1) "a forceful action or procedure (as an unprovoked attack) esp[ecially] when intended to dominate or master"; (2) "the practice of making attacks or encroachments"; or (3) "hostile, injurious, or destructive behavior or outlook esp[ecially] when caused by frustration[.]" *Aggression*, Merriam-Webster's Collegiate Dictionary (11th ed. 2007).

The evidence presented here could support a finding that both parties acted as

- 29 -

aggressors, particularly under the third definition: "hostile, injurious, or destructive behavior or outlook esp[ecially] when caused by frustration." *Id.* In fact, considering the findings in both DVPOs, the findings could indicate that the trial court found that both parties acted as aggressors in harassing the other to the extent that they each inflicted substantial emotional distress upon the other. But the trial court did not make "detailed" findings on this factor, and because the trial court is the sole judge of the weight and credibility of the evidence, remand is necessary for the trial court to consider whether the evidence supports the required findings for mutual DVPOs.

The last requirement for mutual DVPOs is that "the right of each party to due process is preserved." N.C. Gen. Stat. § 50B-3(b). Plaintiff does not argue on appeal that her right to due process was impaired. Both parties received a full hearing on their respective domestic violence claims. *See Holder v. Kunath*, 244 N.C. App. 605, 609, 781 S.E.2d 806, 808 (2016)("[North Carolina General Statute Section] 50B-3(b) . . . which governs the granting of mutual DVPOs when, as here, both parties have filed motions, states that the court must ensure that 'the right of each party to due process is preserved' before entering mutual orders. Under both the federal and state constitutions, 'the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.' " (citation and brackets omitted)). Thus, Plaintiff's right to due process was preserved in this case.

In reading the trial court's orders together, these orders were intended to be mutual DVPOs, granting reciprocal protections requested by claims filed by each

party at the same time after a full hearing on both the claim and counterclaim. Because the trial court did not make the required findings under North Carolina General Statute Section 50B-3 to support entry of mutual DVPOs, we must vacate the trial court's order granting Defendant protection against Plaintiff and remand for entry of a new order including findings as required by North Carolina General Statute Section 50B-3 based on the evidence presented at the hearing on 30 April 2024. In particular, if the trial court determines that such findings are warranted, it must make "detailed findings of fact indicating that both parties acted as aggressors" and findings "that neither party acted primarily in self-defense." N.C. Gen. Stat. § 50B-3(b). On remand, the trial court shall make any findings of fact it deems supported by the evidence; this opinion does not require entry of a new DVPO. If the trial court is unable to make the required "detailed findings of fact" supporting entry of a mutual DVPO, the trial court may enter an order denying the DVPO.

We recognize that the end result could be that although we have determined that the trial court would not have erred in entering a DVPO against Plaintiff if Defendant's claim had been brought independently, the DVPO may ultimately fail because it was entered as part of a mutual DVPO. This case is also complicated by the fact that Defendant did not appeal the DVPO entered against him, so that DVPO

remains undisturbed[1] regardless of the result on remand of Defendant's Amended DVPO against Plaintiff. Defendant did not appeal Plaintiff's DVPO entered against him so this Court has no jurisdiction to review it and this opinion has no effect on that DVPO.

We also appreciate the trial court's frustration with the inadequacy of the standard AOC domestic violence order form, AOC-CV-306, Rev. 3/22, based on the need for the findings required by statute and for the information in the DVPO to "fit in[to] the computer." *See* N.C. Gen. Stat. §§ 50B-3(c)-(d). Although North Carolina General Statute Section 50B-3 was amended in 1996 to add the requirements for specific findings for entering mutual DVPOs, *see* N.C. Sess. Laws 1995-591, the standard AOC domestic violence order form, Form AOC-CV-306, Rev. 3/22, has not been revised nor has a new form been created to facilitate entry of mutual DVPOs under North Carolina General Statute Section 50B-3. Revision of Form AOC-CV-306, Rev. 3/22, or adoption of a new form for entry of mutual DVPOs would likely be of great assistance to our trial courts, parties seeking protection from domestic violence, and law enforcement agencies who must register and enforce these orders.

### III. Conclusion

---

[1] We recognize that both DVPOs may have expired one year after the date of entry, unless renewed under North Carolina General Statute Section 50B-3(b). *See* N.C. Gen. Stat. § 50B-3(b) ("Protective orders entered pursuant to this Chapter shall be for a fixed period of time not to exceed one year. The court may renew a protective order for a fixed period of time not to exceed two years[.]"). But for the same reasons this appeal is not moot, even if Defendant's Amended DVPO has expired and has not been extended, the trial court is required to enter a new order as directed by this opinion.

The trial court's findings were supported by competent evidence except for the portion noted above, and the remaining findings support the conclusion that Plaintiff committed an act of domestic violence under North Carolina General Statute Section 50B-1. But because the two DVPOs were mutual DVPOs under North Carolina General Statute Section 50B-3(b), the DVPO on appeal was required to include "detailed findings of fact indicating that both parties acted as aggressors," and "that neither party acted primarily in self-defense." N.C. Gen. Stat. § 50B-3(b). The DVPO on appeal did not include these findings so we vacate the order and remand for entry of a new order based on the evidence presented at the hearing on 30 April 2024, including appropriate findings and granting appropriate relief based on those findings.

VACATED AND REMANDED.

Judges ZACHARY and COLLINS concur.